# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,

Plaintiffs-Appellees,

v.

MARGE BOSTELMANN, *et al.*,

Defendants

and

REPUBLICAN NATIONAL COMMITTEE, *et al.*

Defendants-Appellants

---

SYLVIA GEAR, *et al.*,

Plaintiffs-Appellees,

v.

MARGE BOSTELMANN, *et al.*,

Defendants

and

REPUBLICAN NATIONAL COMMITTEE, *et al.*

Defendants-Appellants

---

REVEREND GREG LEWIS, *et al.*,

Plaintiffs-Appellees,

v.

MARGE BOSTELMANN, *et al.*,

Defendants

and

REPUBLICAN NATIONAL COMMITTEE, *et al.*

Defendants-Appellants

---

On Appeal From The United States District Court For The Western District Of Wisconsin
Case Nos. 3:20-249, 3:20-278 & 3:20-284, The Honorable Judge William M. Conley Presiding

---

## *GEAR* PLAINTIFFS' RESPONSE IN OPPOSITION TO INTERVENOR-DEFENDANTS-APPELLANTS' MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING APPEAL

1

DOUGLAS M. POLAND
DAVID P. HOLLANDER*
RATHJE WOODWARD LLC
10 E Doty Street, Suite 507
MADISON, WI 53703
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com
Phone: (608) 960-7430

JON SHERMAN*
MICHELLE KANTER COHEN*
CECILIA AGUILERA*
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 450
Washington, DC 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
Phone: (202) 331-0114

*Applications for admission forthcoming

*Attorneys for Plaintiffs-Appellees*

Just ten days ago, when Governor Evers issued Wisconsin's Stay-At-Home Emergency Order, more than 54,000 Americans were confirmed to have COVID-19; in the short time period since then, the infection rate has nearly quadrupled to over 200,000 cases, with 4,513 Americans having lost their lives to the disease.[1]  As of the afternoon of April 3, according to the Wisconsin Department of Health Services, 1,730 Wisconsin residents have tested positive for COVID-19, and 31 people have died from the virus.[2]  Millions of Americans living with heart disease, diabetes, lung conditions, and other health issues—including the individual Plaintiffs in these consolidated cases—find themselves at severe risk of illness or death.[3] It is under these dire conditions and fast-moving developments that Wisconsin election officials are conducting an election, while voters remain confined to their homes pursuant to an emergency order and rightly anxious over their health and that of their loved ones.

This public health crisis presents unparalleled challenges for the functioning of our democracy, which require immediate and reciprocal responses.  There is no doubt that it confronts voters, elected officials, and judges alike with novel issues.  Despite the clear need for action, however, Wisconsin government officials with the power to make necessary changes to the April 7 Spring Election chose inaction, declining to make even small adaptations to the state's mail-in ballot witness requirement to allow voters at risk of severe illness or death from COVID-19 greater flexibility to cast their ballots and have them counted. As a result, it has fallen on individual voters, membership organizations, and now a federal district court to initiate and implement these

---

[1] *See Cases in U.S.*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Apr. 2, 2020).

[2] https://www.dhs.wisconsin.gov/outbreaks/index.htm (last updated April 3, 2020).

[3] *See People Who Are at Higher Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated Apr. 2, 2020).

urgently-needed changes. This Court is now asked to stay the critical relief provided by the district court's order, and thereby participate in the effective disenfranchisement of hundreds of thousands of Wisconsin voters who will be forced to choose between exercising their fundamental right to vote and their health and well-being. Such a result is patently at odds with the public interest and unjustifiable under the current circumstances. The Court should therefore deny the motion to stay and permit the district court's order to go into effect.

## LEGAL STANDARD

"In deciding whether to stay a federal court decision (other than a money judgment) while review proceeds, on appeal or otherwise, courts consider [1] the merits of the moving party's case, [2] whether the moving party will suffer irreparable harm without a stay, [3] whether a stay will injure other parties interested in the proceeding, and [4] the public interest." *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019) (citing *Nken v. Holder*, 556 U.S. 418, 428 (2009)). To prevail, the movant must demonstrate that the district court abused its discretion. *Id.*

## ARGUMENT

**I.** ***The balance of the equities and the public interest favor denying the Intervenor-Defendant-Appellants' motion for a stay.***

   **a. The Supreme Court's decision in *Purcell v. Gonzalez* does not stand for the proposition that an injunction affecting election laws may never issue close to an election.**

*Purcell v. Gonzalez*, 549 U.S. 1 (2006), did not create a per se rule mandating that courts reject any claim brought within a certain timeframe before an election. Instead, this precedent urges courts to weigh the inconveniences and burdens of last-minute rule changes before an election. *Purcell* considered Arizona's newly implemented voter identification and proof of citizenship laws. The district court had denied the plaintiffs' request for a preliminary injunction but did not at that time issue its findings of fact or conclusions of law. *Id.* at 3. The plaintiffs

4

appealed to the U.S. Court of Appeals for the Ninth Circuit and sought an injunction pending appeal. *Id*. In a "four-sentence order," the Ninth Circuit enjoined Arizona from enforcing the voter identification and proof of citizenship laws but "offered no explanation or justification for its order." *Id*. In a short *per curiam* order, the Supreme Court vacated the Ninth Circuit injunction. *Id*. at 4-6. The Court appeared to rely on the fact that Election Day was imminent and its belief—which it speculated the Ninth Circuit panel might have shared—that court orders affecting elections can cause administrative burdens, voter confusion and turnout decline:

> Faced with an application to enjoin operation of voter identification procedures just weeks before an election, the Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase. So the Court of Appeals may have deemed this consideration to be grounds for prompt action.

*Id*. at 4-5; *see id*. at 5 (referencing "the necessity for clear guidance" for election administrators). The Court "underscore[d]" in closing that it was "express[ing] no opinion here on the correct disposition, after full briefing and argument of the appeals . . . or on the ultimate resolution of these cases." *Id*. at 5. *Purcell* did not hold that injunctions affecting election laws may never issue close to an election; rather, it merely said that election cases bear unique considerations and the sensitivity of and risks involved in these cases increase as Election Day draws closer.

The Court should apply the equitable factors to review the denial of a request for a preliminary injunction announced in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and election-related considerations referenced in *Purcell* should be analyzed under *Winter*'s balancing of equities and public interest factors. *See generally* Richard L. Hasen, *Reining in the* Purcell *Principle*, 43 FLA. ST. U. L. REV. 427, 429 (2016) ("[T]he *Purcell* principle should properly be understood not as a stand-alone rule but instead as relevant to one of the factors (the

public interest) the Court usually considers."). As dictated by *Purcell*, "considerations specific to election cases" must be weighed in conjunction with – not to the exclusion of – the other equitable factors for injunctive relief. 549 U.S. at 4. These considerations include but are not limited to the risk of late-breaking rule changes increasing administrative burdens, exacerbating voter confusion, and suppressing turnout. Arguments as to the first relate to the balancing of the equities or harm to the parties, while arguments as to voter confusion and suppressed turnout relate to the public interest, *i.e.* potential harm to non-parties.

The Court should not automatically conclude – based on *Purcell* – that it must refrain from ordering a change in election rules, simply because an election is approaching. When reviewing requests for preliminary injunctions involving elections, courts must still consider such requests under the framework identified in *Winter*. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. *Purcell* itself instructs courts to consider all the equitable factors set out in a standard such as the one in *Winter*, stating that "the Court of Appeals was required to weigh, *in addition to the harms attendant upon issuance or nonissuance of an injunction*, considerations specific to election cases and its own institutional procedures." 549 U.S. at 4 (emphasis added).

There is no doubt that ensuring voters' confidence in the integrity of elections is an important state interest. *Purcell*, 549 U.S. at 4. But so too is protecting voters' perception of fairness and legitimacy in elections, which is undermined when "legitimate votes [are] not counted due to no fault of the voters . . .". *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). "[T]he public interest is served when constitutional rights are protected." *Id.*

(quoting *Meledres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)).  And more specifically, courts have routinely ruled that there is a clear public interest in the ability of qualified citizens to exercise their fundamental right to vote.  *See Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest . . . favors permitting as many qualified voters to vote as possible."); *see also Purcell*, 549 U.S. at 4 (noting that the public has a "strong interest in exercising the fundamental political right to vote" (citations omitted)).  In this way, *Purcell* requires courts to take into account both the state's interest in avoiding the administrative burdens of last-minute rule changes and the right to vote, with greater weight afforded to voters when the threat of disenfranchisement is high. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019) ("Without a doubt, Florida has a legitimate and strong interest in preventing voter fraud. But that interest is not mutually exclusive of vote-by-mail and provisional voters' interest in not being disenfranchised through no fault of their own." (internal citation omitted)); *Obama for Am. v. Husted*, 697 F.3d 423, 436–37 (6th Cir. 2012) ("While states have 'a strong interest in their ability to enforce state election law requirements,' the public has a 'strong interest in exercising the 'fundamental political right' to vote.' 'That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful.' (internal citations omitted)); *U.S. Student Ass'n Fdn. v. Land*, 546 F.3d 373, 387 (6th Cir. 2008) ("*Purcell,* however, demands 'careful consideration' of any legal challenge that involves 'the possibility that qualified voters might be turned away from the polls.'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006))).

For these reasons, circuit courts have upheld injunctions issued shortly before an election where the challenged law or rule would have the effect of disenfranchising voters. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (finding that, "absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present federal

election cycle.") (reversing district court's denial of motion for preliminary injunction related to the federal voter registration form and issuing injunction 13 days before voter registration deadline in relevant states); *Husted*, 697 F.3d at 436–37 ("The burden on non-military Ohio voters' ability to cast ballots, particularly when many of those voters will likely be unable to vote on Election Day or during the day at local boards of elections because of work schedules, outweighs any corresponding burden on the State . . ."); *Land*, 546 F.3d at 387 (upholding district court's finding "that staying the preliminary injunction would likely put individual voters at risk of disenfranchisement.") (denying 6 days before Elections Day defendants' motion to stay the district court's order granting preliminary injunction, issued 22 days before Election Day). Here, that is exactly the result that the *Gear* plaintiffs seek to prevent: disenfranchisement caused through no fault of their own, but solely by their right and desire to protect their health, adherence to the Governor's Stay-At-Home Order and public health experts' recommendations, and the state's insistence on enforcing the witness requirement.

### b. *Purcell* and its animating considerations are readily distinguishable from the instant action.

#### 1. Proximity to Election Day

First and foremost, Plaintiffs-Appellees' lawsuit was filed so soon before the April 7, 2020 elections, not because Plaintiffs sat on their rights for months and years, but rather, because the COVID-19 pandemic did not gather full force in a way that sank into public—and public officials'—consciousness and drive the imposition of stay-at-home, self-quarantine orders until mid-to-late March. Wisconsin's Emergency Order #12 was not issued until March 24, 2020. Necessity has dictated the late-breaking nature of the preliminary injunction's terms. Plaintiffs had no reason to know that the witness requirement for mail-in absentee ballots would impose such a severe and undue burden on their right to vote until very recently. Indeed, as is clear from

the data on absentee ballot requests, many Wisconsin voters are likely voting by mail for the first time in their lives and did not expect to be voting by mail.

## 2. Voter Confusion

Second, the Supreme Court identified the minimization of voter confusion as an underlying reason to disfavor late-breaking changes to election and voting requirements. But the risk of voter confusion—in this context, the difficulties of communicating a change in the law—should not prevent the entry of an injunction close to an election, where that change reduces or eliminates severe undue burdens on voters' rights and promotes and facilitates the casting and counting of ballots for people who are threatened with disenfranchisement.

Denying a stay of the district's court's preliminary injunction will not sow any more confusion than has already been created by the Wisconsin Elections Commission prior to the issuance of the injunction. If anything, granting a stay will only exacerbate and perpetuate that confusion. *Cf. Newby*, 838 F.3d at 14 ("But there is confusion now, as the declarations submitted by appellants show. An agency should not be allowed to claim that the confusion resulting from its own improper action weighs against an injunction against that action.").

*League of Women Voters of the United States v. Newby* is instructive here. There, in response to requests from Alabama, Georgia, and Kansas, the executive director the Election Assistance Commission, Brian Newby, approved revisions to the federal voter registration form providing revised state-specific instructions for each of those states, requiring voters to provide documentary proof of U.S. citizenship in order to register to vote. 838 F.3d at 6. Of those three states, only Kansas, however, was enforcing the proof of citizenship requirement. *Id.* As a result of the new requirement, approximately 17,000 Kansas applicants could not register and were instead placed on a suspension list. *Id.* at 13. The district court denied the plaintiffs' motion for a

temporary restraining order and preliminary injunction. *Id.* at 6. The D.C. Circuit reversed. Although it conceded that restoring the previous version of the federal voter registration form, without the proof of citizenship requirement, could produce confusion, it determined that the new form had itself generated confusion and that the risk of disenfranchisement outweighed any confusion caused by restoring the old version of the form. *Id.* at 14.

Wisconsin has itself witnessed this type of last-minute but necessary court action in its own elections. In the 2014 general election, a district court enjoined Wisconsin's photo ID law, and less than two months before the midterm elections, the U.S. Court of Appeals for the Seventh Circuit reversed and stayed the district court's permanent injunction. *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014), *rev'd by* 768 F.3d 744 (7th Cir. 2014). The plaintiffs immediately sought emergency relief at the U.S. Supreme Court. While the Supreme Court's order was sparse, the 6-3 majority's grant of the application to vacate the stay and thus leave the photo ID law enjoined for the election appears to have been based on concerns for voter confusion. *Frank v. Walker*, 135 S. Ct. 1551 (2015) (mem.). Even the dissent was compelled to acknowledge that it was "particularly troubling that absentee ballots [had] been sent out without any notation that proof of photo identification must be submitted." *Id.*

Here, as in *Frank v. Walker* and *League of Women Voters of the United States v. Newby*, any voter confusion caused by enjoining the witness requirement during a pandemic and shortly before an election is far outweighed by the disenfranchisement of countless eligible Wisconsin voters who live alone, are self-quarantining, and reasonably fear that interacting with a witness to secure a signature would needlessly risk their contraction of COVID-19. *See*, *e.g.*, *Frank v. Walker*, No. 11-C-1128, 196 F. Supp. 3d 893 at 917-918 (E.D. Wis. July 19, 2016) (ordering implementation of affidavit alternative to voter identification requirement) ("[A]ny confusion that

arises will likely only affect those voters who would be unable to vote without the affidavit option. . . . [D]isenfranchising those voters while this litigation is pending would be worse than causing them to be confused after trial, when they would likely be unable to vote anyway due to their inability to obtain ID with reasonable effort.").

Granting the requested stay would only add to any confusion. On the one hand, voters who are self-isolating without another adult U.S. citizen will have likely read the copious news reports on the district court's order[4] and could reasonably believe they can submit a reasonable efforts statement with their ballots. But more importantly, if the stay is granted, they will find themselves having to navigate the substantially more confusing and burdensome process of obtaining a witness during the Stay-At-Home Order. A guidance memorandum issued by Defendant Administrator Meagan Wolfe on March 29, 2020 highlights this point. *See* 20-cv-249, Dkt. 166-1. The memo suggests that voters ask a delivery person to witness their ballot, assuming that person is a U.S. citizen, or that they use a video chat platform like Skype or Facetime to connect with a potential witness. *See id.* at 2. It specifically recommends the following process for satisfying the witness requirement:

---

[4] *See, e.g.*, Todd Richmond, *Judge won't delay Wisconsin election but extends voting*, AP NEWS (Apr. 3, 2020), https://apnews.com/e36c3adc0c7474014f3e7ab566071303; Patrick Marley, *"This is a mess": Wisconsin elections officials say absentee ballot deadline could throw off results*, MILWAUKEE JOURNAL SENTINEL (Apr. 3, 2020), https://www.jsonline.com/story/news/politics/2020/04/03/wisconsin-election-officials-absentee-ballot-deadline-change-results/5119030002/; Patrick Marley, *Wisconsin's election is still April 7, but a federal judge has extended the deadline for absentee votes to be counted*, MILWAUKEE JOURNAL SENTINEL (Apr. 2, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/02/wisconsin-election-judge-extends-absentee-voting-but-keeps-vote-date/5112276002/; Zach Montellaro, *Judge declines to postpone Wisconsin elections, extends absentee voting*, POLITICO (Apr. 2, 2020), https://www.politico.com/news/2020/04/02/judge-wisconsin-absentee-voting-coronavirus-162203; Pete Williams, *Judge won't delay next week's Wisconsin primary over coronavirus concerns*, NBC NEWS (Apr. 2, 2020), https://www.nbcnews.com/politics/2020-election/judge-won-t-delay-wisconsin-s-april-7-primary-election-n1175386.

1. Voter receives their absentee ballot by mail.
2. Before retrieving their ballot, the voter should wash or sanitize their hands and take extra care not to cough on balloting materials.
3. The voter opens their absentee materials envelope and places the certificate envelope outside their door, in a mailbox, etc. where a person who is providing supplies or services can access it. If possible, the voter should put the certificate envelope and leave it untouched for 24 hours before the witness handles it.
4. When someone arrives to provide the voter with supplies or services, they ask them to be a witness for their ballot. The witness should be prepared to watch the voter mark their ballot through a window or by video chat.
5. Before the voter marks their ballot and before the witness signs the certificate, they should both wash or sanitize their hands and take extra care not to cough on ballot materials.
6. The voter marks their ballot in view of the witness, but with a physical barrier between them or by video chat.
7. The witness signs the absentee certificate envelope and provides their required information. The witness then leaves the signed certificate on the door step, in a mailbox, etc. for the voter to retrieve.
8. The voter washes or sanitizes their hands and then retrieves the signed certificate envelope.
9. The voter takes extra care not to cough on balloting materials and places the marked ballot into the envelope. The voter signs and completes the required fields on the certificate envelope.
10. The voter mails the marked ballot and completed certificate envelope.
11. By the time the clerk receives the ballot any potential contamination will be degraded, and the clerk and poll worker should follow their instructions for processing ballots.

*Id.* Yet days after Defendant Administrator Wolfe submitted this memo to the Defendant Commissioners, in a post to its official Twitter page,[5] the Wisconsin Election Commission referred voters to an instructional video[6] about satisfying the witness requirement during the Stay-At-Home Order produced by the blog As Goes Wisconsin, in which the character who is supposed to serve as the voter's witness does not actually appear to observe the voter complete her ballot, in violation

---

[5] Wisconsin Elections Commission (@WI_Elections), TWITTER (Apr. 1, 2020, 1:15 PM), https://twitter.com/WI_Elections/status/1245399321706545152.

[6] Kristen Brey, *Can I Get a Witness?*, AS GOES WISCONSIN (Mar. 31, 2020), https://asgoeswisconsin.com/blog/canigetawitness.

of step 6 of the memo's recommendations.[7] The witness character also appears to violate steps 7 through 10 by mailing the voter's ballot for her.[8]

In sum, the Wisconsin Elections Commission has already created confusion by providing the public with contradictory information about satisfying the witness requirement while self-isolating due to COVID-19. Those onerous steps it did outline do not adequately consider voters who live in apartments, are homebound, and who may not have access to video chat technology or who may not be able to operate such technology without assistance, and may very well cause voters to forego their right to vote in order to protect their health. The district court's order reduces this confusion and provides relief for voters who are unable to comply with the Commission's recommended witnessing process, by allowing voters to provide an affirmation in lieu of a witness signature, if they cannot safely obtain a witness signature. As such, this Court should uphold the order and deny the motion to stay.

### 3. Administrative Burden and Costs

Third and finally, Wisconsin election authorities will not suffer an increased administrative burden or incur increased administrative costs from this preliminary injunction's requirement to accept absentee mail-in ballots that lack a witness signature but bear a reasonable efforts statement. Municipal clerks and city election commissions must process each absentee ballot and instead of rejecting and segregating such ballots, they will process and count those ballots that contain a reasonable effort statement consistent with the court's order. Even assuming for the sake of argument there were any additional costs or administrative burdens, the U.S. Supreme Court has explicitly stated that constitutional rights do not bend to administrative convenience and financial

---

[7] *Id.*
[8] *Id.*

considerations. *See, e.g., Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 218 (1986) (striking down Connecticut's closed primary law on First Amendment associational rights grounds) ("Costs of administration would likewise increase if a third major party should come into existence in Connecticut, thus requiring the State to fund a third major party primary. Additional voting machines, poll workers, and ballot materials would all be necessary under these circumstances as well. But the State could not forever protect the two existing major parties from competition solely on the ground that two major parties are all the public can afford."). This portion of the *Winter* test therefore bends in favor of Plaintiffs and militates against a stay.

## II. *Plaintiffs are likely to succeed on the merits of this appeal.*

Plaintiffs are likely to succeed on the merits of their *Anderson-Burdick* claim. Under the circumstances of this pandemic and with Emergency Order #12 in place, the witnessing requirement for mail-in absentee voters, Wis. Stat. § 6.87(4)(b)1., constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement. The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id.*, at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also One Wisconsin Institute, Inc. v. Thomsen*, 15-cv-324-jdp, 2016 WL 4059222 at *3 (W.D. Wis. July 29, 2016) ("This analysis proceeds under

what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I determine the extent of the burden imposed by the challenged provision. Second, I evaluate the interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden.").

As the *Gear* Plaintiffs noted in their Brief in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction:

> All of the information about COVID-19 made publicly available by government agencies like the Centers for Disease Control and Prevention ("CDC") demonstrates the unique circumstances and burdens the pandemic has created for Wisconsin's voters and election systems. Every state and the District of Columbia has reported confirmed cases of infection. PFOF No. 2. Over 85,000 cases have been confirmed in the United States, and over 1,200 patients have died. PFOF No. 2. In Wisconsin, 842 confirmed cases and 13 deaths had been reported as of March 27, 2020. PFOF No. 3. The disease is so prolific and so lethal that the World Health Organization declared it a pandemic on March 11, 2020, and the President of the United States declared a national emergency on March 13. PFOF Nos. 5 & 10. According to the CDC, people who are 65 years old or older or who have underlying health conditions and diseases, such as chronic lung diseases, asthma, diabetes, serious heart conditions, and others that suppress immune systems like HIV/AIDS, are at higher risk of severe illness or death from COVID-19. PFOF No. 6. COVID-19 can lead patients to develop pneumonia, respiratory distress, and sepsis, which in turn can result in death. PFOF No. 7.

No. 20-cv-00278-wmc, dkt. 17.

The witness signature requirement for mail-in absentee ballots requires voters who vote by mail to obtain an adult U.S. citizen's signature certifying that the voter cast the mail-in ballot themselves. Wis. Stat. § 6.87(4)(b)1; No. 20-cv-00278-wmc, dkt. 16, No. 13 (Form EL-122). Under the circumstances of the COVID-19 pandemic, which has led both the federal and Wisconsin state governments to declare emergencies and has led Governor Evers and Secretary Palm to issue Emergency Order #12, which directs Wisconsin residents to stay at home (with limited exceptions) and bans "[a]ll public and private gatherings of any number of people that are not part of a single household or living unit," it is not safe, reasonable, or even logical to require

15

mail-in absentee voters who live alone or lack an adult U.S. citizen living in their household to seek out and obtain a witness's signature in order for their ballots to be validly cast and counted.

Plaintiffs Sylvia Gear, Malekeh Hakami, Patricia Ginter, and Claire Whelan are U.S. citizens and eligible, registered Wisconsin voters. No. 20-cv-00278-wmc, dkt. 16, no. 21. Plaintiff Gear is a member of the Wisconsin Alliance. *Id.*, No. 26. Plaintiff Whelan is a member of the LWVWI. *Id.* No. 27. Plaintiffs Gear, Hakami, and Ginter are all above the age of 65. *Id.* No. 22. Plaintiffs Gear, Hakami, Ginter, and Whelan all have underlying health conditions that, according to the CDC, put them at an increased risk of severe illness or death from COVID-19. *Id.* Nos. 6 & 23. Plaintiffs Gear, Hakami, Ginter, and Whelan each live on their own. Dkt. 16 No. 24. They reasonably believe that finding someone to witness and sign their ballots will expose them to contracting COVID-19, and with it, severe illness or even death. *Id.* Nos. 28–31. As is made clear by the CDC's recommendations and Wisconsin's Emergency Order #12, Plaintiffs cannot obtain a witness signature requirement on their mail-in absentee ballots without seriously jeopardizing their health and life through possible exposure to the novel coronavirus that causes COVID-19. Forcing these highly vulnerable voters who live alone to take this risk in order to validly vote imposes a severe burden on their voting rights.

Continuing to require a witness signature on a mail-in ballot in the face of this fast-spreading pandemic lacks sufficient support from a legitimate government interest that is sufficiently "compelling" or "important," *Burdick*, 504 U.S. at 434, in this context and under these circumstances, and must be enjoined. First, the witness requirement is an incredibly weak, borderline ineffectual, anti-fraud tool. Anyone dumb and immoral enough to willfully cast a fraudulent absentee ballot will be committing perjury in signing the *voter* certification. Such a determined fraudulent voter will not be deterred by the separate *witness* certification; they will

16

simply sign a different name in different handwriting.  Thirty-nine states and D.C. have concluded that there is no need for such a witnessing requirement that applies to *all* mail-in absentee voters, not just the ones that receive assistance, and do not have such a law.  *Cf.* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15-220, 7-15-230; Va. Code Ann. §§ 24.2-706, 24.2-707; Wis. Stat. § 6.87(4)(b)1.

Second, even if there were a modicum of value to law enforcement in the separate witness certification, that value would be erased by the sheer number of mail-in absentee ballots cast in the state, and the number of voters who would be disenfranchised in the name of that minimum value; an unprecedented number of mail-in ballots are being requested during this pandemic.  As of today, more than 1,197,472 voters had requested absentee ballots in Wisconsin, roughly double the number of requested during the 2018 midterm elections.  *Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary*, WIS. ELECTIONS CMM'N, https://elections.wi.gov/node/6808 (last updated Apr. 3, 2020); No. 20-cv-00278-wmc, dkt. 16, No. 15.  No. 20-cv-00278-wmc, dkt. 16, No. 15.  Given these circumstances and the expected increased volume of mail ballots, state and local law enforcement authorities simply cannot mine and review hundreds of thousands and, in statewide and presidential elections conducted mostly by mail, millions of witness signature certifications.  And, even if they did, there would be nothing to arouse suspicion from the face of the witness certification.

Third and finally, continuing to strictly enforce subsection 6.87(4)(b)1. would directly contradict the state's interest in maintaining the strict separation of people who are not family members, as manifest on every page of Emergency Order #12. *Id.* No. 11.  The Emergency Order's

measures are intended to drastically slow the spread of COVID-19 and protect the lives of people like Plaintiffs, who due to advanced age and chronic illnesses or other conditions are at severe risk of complications up to and including death from contracting COVID-19. *Id.* Nos. 6 & 7. In this specific context, a subset of mail-in absentee voters who live alone or do not have an adult U.S. citizen in their household are truly unable to simultaneously comply with both the requirements of Emergency Order #12 and subsection 6.87(4)(b)1. The state interests animating these provisions are in direct conflict, and voters are being forced to resolve that conflict and face grim choices— put their health and life in jeopardy, or lose their right to vote.

Given the circumstances of the COVID-19 pandemic, eligible Wisconsin voters who live alone or who do not have an adult U.S. citizen living in their household cannot comply with the requirements of Wis. Stat. § 6.87(4)(b)1. and cast a mail-in absentee ballot that will count. Therefore, under these circumstances and for the duration of the pandemic and the state's emergency orders requiring voters to self-quarantine unless necessary for essential functions or emergency needs, Section 6.87(4)(b)1. now creates an undue burden on mail-in absentee voters' right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as construed by *Anderson* and *Burdick*. This is a balancing test, and the disenfranchisement that will result from issuing a stay of the district court's relief far outweighs the risk of any fraud here.

In-person voting of course is not a reasonable alternative, as that would require the individual Plaintiffs and thousands more eligible Wisconsin voters to enter a confined space with significantly more people than would be required to witness the casting of a mail-in absentee ballot and would pose an even greater risk to the voter's health and life.

18

For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their claim that Defendants have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

**III.** ***If a stay is granted, Plaintiffs are certain to suffer irreparable harm because there is no way to regain one's right to vote after an election is held.***

The Seventh Circuit has stated that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978); *see also Ezell v. City of Chicago*, 651 F.3d 684, 697-700 (7th Cir. 2011) (finding irreparable harm when plaintiffs' Second Amendment rights were likely violated). "When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Husted*, 697 F.3d at 436 (citations omitted) (affirming preliminary injunction against law which imposed shorter in-person early voting period for nonmilitary Ohio voters than for military voters).

In virtually all circumstances implicating the exercise of voting rights, courts have found that the harm is irreparable because a violation of constitutional rights that implicate a voter's ability to cast a ballot cannot be redressed after the election. *Common Cause Ind.*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018), *aff'd*, 937 F.3d 944 (7th Cir. 2019) ("A violation of the right to vote is presumptively an irreparable harm.") (citing *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 1440–41 (2014); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Elrod v. Burns*, 427 U.S. 347, 373-74 & n.29 (1976) (plurality opinion); *Ezell*, 651 F.3d at 699)) (additional citations omitted); *Dillard v. Crenshaw,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").

If the district court's injunction is stayed, Plaintiffs are certain to suffer irreparable harm because there is no way to regain one's right to vote after an election is held. Plaintiffs Sylvia Gear, Malekeh Hakami, Patricia Ginter, and Claire Whelan are U.S. citizens and eligible, registered Wisconsin voters. No. 20-cv-00278-wmc, dkt. 16, No. 21. Plaintiff Gear is a member of the Wisconsin Alliance, *id.* No. 26, and Plaintiff Whelan is a member of the LWVWI, *Id.* No. 27. Plaintiffs Gear, Hakami, and Ginter are all above the age of 65. *Id.* No. 22. Plaintiffs Gear, Hakami, Ginter, and Whelan all have underlying health conditions that, according to the CDC, put them at an increased risk of severe illness or death from COVID-19. *Id.* No. 23. Plaintiffs Gear, Hakami, Ginter, and Whelan all live on their own. *Id.* No. 24. Accordingly, there is no feasible, safe way for Plaintiffs Gear, Hakami, Ginter, and Whelan to have an adult U.S. citizen witness them casting their absentee ballots and sign the certification. Doing so would run counter to the federal and state governments' mandates and recommendations, including Emergency Order #12's directives, and would seriously jeopardize Plaintiffs' health and lives. Additionally, in-person voting would present an even greater risk to their health and lives.

Once the election is held and the results are certified, the injury to these voters' constitutional rights will of course be irreparable. There is no adequate remedy at law, no damages, that can make a disenfranchised voter whole. In addition, the LWVWI and the Wisconsin Alliance will both be irreparably harmed because their members will be disenfranchised, *see id.* Nos. 26 & 27, and because both organizations have diverted resources to try to assist voters with voting absentee under these circumstances, including related to addressing the witness requirement, *see id.* Nos. 35-37 & 42-44.

## CONCLUSION

For the foregoing reasons, this Court should deny the application for stay.

DATED: April 3, 2020          Respectfully submitted,

BY:    */s/ Douglas M. Poland*

DOUGLAS M. POLAND
DAVID P. HOLLANDER*
RATHJE WOODWARD LLC
10 E Doty Street, Suite 507
MADISON, WI 53703
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com
Phone: (608) 960-7430
*Application for admission forthcoming

JON SHERMAN*
MICHELLE KANTER COHEN*
CECILIA AGUILERA*
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 450
Washington, DC 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
Phone: (202) 331-0114

*Application for admission forthcoming

*Attorneys for Plaintiffs-Appellees Sylvia Gear,
Malekeh K. Hakami, Patricia Ginter Claire
Whelan, Wisconsin Alliance for Retired Americans
and League of Women Voters of Wisconsin*